PEOPLE v. O'REILLY.

(Supreme Court, Appellate Division, First Department. December 13, 1912.)

1. RECEIVING STOLEN GOODS (§ 8*)—EVIDENCE.
    Evidence in a trial of a lawyer for criminally receiving stolen property while assisting the thieves in obtaining a reward for its return *held* to sustain a verdict of guilty.

    [Ed. Note.—For other cases, see Receiving Stolen Goods, Cent. Dig. §§ 15–18; Dec. Dig. § 8.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. RECEIVING STOLEN GOODS (§ 4*)—ELEMENTS OF OFFENSE.

　　Where a lawyer, while representing thieves in obtaining a reward for the return of stolen property, receives the property, knowing it to have been stolen, and keeps it until the reward is paid, and then delivers it over to the representative of the owner, he is guilty as principal, within Penal Law (Consol. Laws 1909, c. 40) § 1308, of receiving stolen property knowing it to have been stolen, or withholding it for reward, and it is immaterial that for his own protection he has induced the owner's representative to nominally retain him to assist in recovering the property.

　　[Ed. Note.—For other cases, see Receiving Stolen Goods, Cent. Dig. § 6; Dec. Dig. § 4.*]

Appeal from Trial Term, New York County.

Daniel O'Reilly was convicted of criminally receiving stolen property, and he appeals. Affirmed.

See, also, 137 N. Y. Supp. 1135.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

John F. McIntyre, of New York City, for appellant.

Robert C. Taylor, Asst. Dist. Atty., for the People.

INGRAHAM, P. J.　The defendant has been convicted of the crime of criminally receiving stolen property, in violation of section 1308 of the Penal Law (Consol. Laws 1909, c. 40). On March 2, 1911, Aaron Bancroft, a broker of this city, 84 years of age, was carrying securities valued at over $60,000 from his office to the Produce Exchange vaults, when he was jostled by two men, who afterwards appeared to have been known as Yates and Ross, which caused him to drop the envelope in which the securities were contained, whereupon they apologized and helped to brush him off, and one of them handed him what he thought was the envelope containing his securities, which he placed in his safe deposit vault, to discover, four days later, when he had occasion to open it, that it was filled with newspapers. The fact that the envelope substituted for the one containing his securities was similar to that used by him in his office led to the inference that some one familiar with the business methods there had been a party to the crime.

[1] The defendant is not charged with any complicity in the original taking of these securities, but his alleged crime arises from his connection with the return thereof to the attorney for Bancroft for a consideration of $5,000, and with the acts leading up thereto. It appears that William M. Sullivan, who was the attorney for the firm of George Bancroft & Co., had been acting with the police in the endeavor to recover the stolen securities, when on March 24, 1911, he was called up on the telephone by the defendant, who inquired if he represented Bancroft & Co., the owner of certain stolen securities, to which Sullivan replied in the affirmative. The defendant then expressed his desire to see Sullivan, and was told he could do so, whereupon he came to Sullivan's office in a few minutes, and, after stating that he was an attorney, again asked Sullivan if he represented Bancroft & Co., the owner of certain securities that had been stolen, and

when answered in the affirmative went on to say that he knew "the fellows that did the Bancroft job, and my men want to know how much you will pay to get the securities back." Sullivan replied that no reward had been contemplated, but that the premiums to be paid on a bond required to be given to secure the reissue of the certificates would amount to $5,000 or $6,000. The defendant then said, "My men want $20,000 before they will give you the securities;" whereupon Sullivan said, "You say you know the men who did this job?" to which defendant replied in the affirmative, as well as to a further question, "And you know the securities were stolen?" When the defendant was then asked why he did not turn "those fellows" over to the police, he said he could not do that, but that, if he was given $10,000, he would get the securities from the thieves for Sullivan. He then volunetered to see "his men," and see what could be done to induce them to take less than $10,000, and left, promising to return. He again telephoned on the same day, saying he would see "his men" at 2 o'clock in the afternoon, and later sent a third call to the effect that he had seen "his men," and if Sullivan wanted to do business about getting the securities to come to defendant's office at once. Sullivan then went to defendant's office, where he was seated at his desk in his private room with one Frank J. Plass beside him. The defendant introduced Plass as Mr. Smith, whereupon the latter at once arose and said, "Well, are you ready?" Sullivan inquired where they were going, to which O'Reilly answered, "To get the securities." At this time Sullivan had in his possession $10,100 in cash, consisting of ten $1,000 and two $50 bills inclosed in an envelope, whose numbers he had retained. He went with O'Reilly and Plass to the Astor House; Plass going ahead and selecting a taxicab there, and two detectives secretly following at a distance. Defendant said to Sullivan, "Get in," to which Sullivan inquired where they were going, and said they had to be careful, whereupon defendant replied, "It is all right, Mr. Sullivan; you are in my care." Sullivan testified that O'Reilly sat in the back of the taxicab alongside him, with Plass in front of O'Reilly; the vacant seat, which was fastened up, being in front of Sullivan. After the taxicab had gone some distance up Broadway, defendant turned to Plass and said:

"I hope you appreciate that I am in a delicate situation. I could be disbarred for this."

At about Twenty-Third street Plass inquired, "Are you ready to do business?" to which Sullivan replied:

"Why, that is what I am here for. I am here to get the stolen securities."

Plass replied, "Here they are," and pulled them out of his pocket. He then spread them on his lap, while Sullivan took the list from his pocket, and, pulling down the seat that was vacant in front of him, checked them off in lead pencil as they were read off by Plass. As Plass read off the numbers and description of the securities, he handed them to the defendant, who held them. Sullivan testified that he never had physical possession of the securities until he paid the money, and that he looked over O'Reilly's shoulder to verify the certificates before

he checked them off. After the list had been checked, it was found that three certificates, for 100 shares each, of the American Smelters Company, were missing, whereupon Plass said:

"They never were here. I had this envelope less than 30 minutes after the robbery was committed, and it has not left my possession, and I know those securities were not in the envelope."

Sullivan was positive that O'Reilly held the certificates as they were turned over by Plass, and retained them. Two certificates were found and turned over to O'Reilly, which were not on Sullivan's list, and O'Reilly said:

"Well, you see how honest my men are. Here are two certificates that you did not even ask for."

An argument ensued as to the absence of the certificates for 300 shares, and Sullivan refused to pay any money unless he had all the stolen securities, to which defendant replied:

"These securities were never stolen. My men never had them, and I have told you, if you are right about that, and you don't find them down in Bancroft's office, I can get these men any time I want."

Sullivan then paid Plass $5,000, whereupon O'Reilly turned and said, "Well, where do I come in." Whereupon Sullivan, taking off the next bill, said, "I suppose you want this;" to which defendant replied, "Sure;" whereupon Sullivan gave him a $50 bill, and O'Reilly handed him the securities.

The happenings in the cab, of which the foregoing form a part, lasted until the cab had gone through Central Park to 110th street and back to the entrance at the Plaza, where Sullivan left the cab. There was another conversation had later, after an interview with the police by Sullivan, wherein he again asked defendant for the missing securities, to which defendant replied that he had seen his men at the Hotel Belmont after Sullivan had left the cab, that there were three men in the trick and they all told him the shares were never in the envelope, and that Plass had taken him to the Night and Day Bank, and had shown him the empty safe deposit box there, in which these securities had been kept. Sullivan absolutely denied that he ever retained O'Reilly as an attorney, or in any other way, to assist in recovering the securities.

Frank J. Plass, a former convict, testified to the original taking of the securities by Ross and Yates, as described to him by Yates. He said his first meeting with defendant was on March 15th, when he was introduced to O'Reilly at Rector's Café by the name of "Francis," and Yates was introduced to O'Reilly by the name of "Brown." Yates then asked O'Reilly if he had read the papers of March 7th, to which O'Reilly replied: "Yes, I know all about it." Yates said:

"I have those securities. Do you think you can dispose of them?"

To which O'Reilly replied:

"Yes, I am pretty sure I can."

Yates then gave O'Reilly a list of the securities, and the latter requested him to go down to his office the next day and bring some of

the securities with him. The next day Plass did call with Yates at O'Reilly's office. Yates then produced one of the stolen securities and asked O'Reilly if he would get rid of it, to which he said he could through a banker named Clark. Yates offered to allow him 50 per cent. of the market value for his services. At this interview O'Reilly asked, "Was it very easy to get?" to which Yates replied, "Yes;" that the plans were given by a friend named Barrett, a former employé of the Bancroft firm. O'Reilly again asked, "How did you get the securities from the old man?" whereupon Yates again described the operation. O'Reilly said:

"Well, you boys come next day on Friday, and I will let you know if I can get rid of those securities or not."

The next day Yates and Plass called at O'Reilly's office, when the latter returned the certificate, saying he could not get rid of it, and then said:

"I suggest to you to return them to the Bancroft firm for a consideration."

Yates said he wanted $10,000 for the return of the securities, and O'Reilly said he would try to get it for him. He then asked if Yates knew who the attorney for the firm was, to which Yates replied that it was Sullivan or O'Sullivan. There were other conversations with O'Reilly, at all of which the possibility of disposing of the securities was discussed. Finally, as the result of arrangement made by Yates, Plass called at O'Reilly's office, and then the events took place which have been heretofore detailed.

The testimony of Plass is in substantial corroboration of all that occurred in the taxicab, as testified to by Sullivan, including the statement that O'Reilly had physical possession of the securities, which were turned over to him by Plass, and retained by him until the $5,000 and $50 were paid.

George S. Dougherty, superintendent of the Pinkerton Detective Agency, testified to conversations had by him with the defendant on March 16, 1911, and thereafter, at which he says O'Reilly informed him that it would be possible for him, through clients of his, to recover the securities stolen from Bancroft, and also to give information that would result in the apprehension of the thieves and the recovery of the securities at the same time; that O'Reilly said that the persons whom he represented expected to be paid $6,000 for the information, for the recovery of the securities, and the giving up of the thieves. As an evidence of good faith the defendant offered to produce 10 shares of the stolen property, provided the attorney for Bancroft & Co. would deposit the value of the shares. O'Reilly also inquired of him who represented the Bancrofts, to which Dougherty replied, "Sullivan." At a later conversation the defendant suggested that the attorney for the Bancrofts should engage him at a nominal fee of $50 to recover the securities, and if that was agreeable they could be recovered, provided a reward of $6,000 was paid to the persons he represented. He said his actions were legal, if the thing was carried out that way, and he was engaged at a nominal fee of $50. Dougherty was himself engaged for his agency in an effort to recover the se-

curities, and had interviews with Sullivan, as well as with O'Reilly, in that effort. In the course of the conversations he asked O'Reilly how he came in contact with these people without an introduction, as he had said he did not know them, to which the defendant replied that they must have known about his practicing criminal law, and it came to him in that way.

The evidence of Dougherty shows clearly that as early as March 16th statements were made to him by the defendant, indicating beyond a possibility of doubt that defendant was in close touch with the thieves and really represented them. As showing the attitude of the defendant towards Plass, it appears that after Sullivan had left the cab it was driven to the Night and Day Bank, where Plass got one of the large bills changed and gave $833 therefrom to the defendant, who counted it over and put it in his pocket. The special officer at the bank testified to the presence of O'Reilly there at the time referred to by Plass, and that he saw another man go to the paying teller and hand O'Reilly some money. O'Reilly claims that he asked Plass to get the $50 bill changed, and that was the cash that he got. He denies the receipt of any other from Plass. Plass testified that the $5,000 paid by Sullivan was divided among six people, namely, O'Reilly, Plass, Yates, Ross, Barrett, and an unnamed person. After the visit to the bank, Plass and O'Reilly went together to the Hotel Belmont, where the defendant ordered a pint of champagne, which was drunk by the two, and another bottle was then ordered by Plass, of which both partook. During this time the two thieves, Yates and Ross, came into the barroom of the hotel.

The defendant's version of his connection with the matter is that he made the acquaintance of the persons known to him as "Francis" and "Brown" (being Plass and Yates) through an introduction given in Rector's Café on March 15, 1911, by one Lachblock, a horse owner and bookmaker, whom he was unable to procure as a witness upon the trial. The two men were introduced to him as gentlemen who had a case which they wanted him to take up, whereupon they all proceeded to have a drink. An appointment was then made for the two men to come to the defendant's office the following day, which they did, when "Francis" (meaning Plass) said, "I suppose you have read about this Bancroft robbery at the Produce Exchange?" to which the defendant replied, "Yes." Plass then said:

"I have information as to who those thieves were. I can fix it so that for $6,000 I can have the thieves with the bonds on them arrested, if anybody interested in the case is willing to pay me $6,000. If not, I think I could make arrangements for the return of these bonds for $5,000."

The defendant said he would communicate with the people having charge of the matter, having in mind Dougherty of the Pinkerton Agency. Plass then said that to prove his good faith he could get one of the bonds from the people who had them, if the persons would put up the value of the bond as security for its return. Defendant then claims to have called up Dougherty, and to have had conversations with him about the stolen bonds, and in the course of his lengthy testimony he denies most of the statements made by Dougherty as to

what he said during this time. Defendant claims that when he found that there was no desire to arrest the thieves, but simply to procure the return of the securities, he washed his hands of the whole matter. However, his interest was revived, and he promised Dougherty to "try and see those people." He called up Plass at a telephone number which he had, and asked him to come to his office, which he did, whereupon defendant claims that he communicated the willingness of the Bancroft people, as stated to him by Dougherty, to pay $5,000 reward for the return of the securities. Plass promised to see his people and call again; but in the meantime defendant claims to have seen Dougherty and said that under no circumstances would he proceed further unless he was retained as attorney for Bancroft and associated with Sullivan in the recovery of the property. He says that Dougherty then telephoned him that Sullivan would pay a retaining fee of $50 to secure his services to aid in the restoration of the property, and that a reward of $5,000 would be paid for the return of the securities; that he then called up Sullivan on the telephone, being his first telephonic communication with him, and claims that Sullivan said to him over the telephone, "I want to retain you in the Bancroft case." His version of the interview with Sullivan is that the latter offered him a $50 fee to assist in getting the bonds back, and also promised to see that he was properly compensated when his bill was sent to the Bancrofts. He admits that Plass was in his office when Sullivan arrived, and that he introduced the former to the latter, and says that he told Sullivan that they were to go with Plass and meet the men who had the bonds, and he would turn them over for the reward.

There is no dispute as to the trip in the taxicab, but he denies that he told anything to Sullivan about the taking of the securities, although he admits that Plass told him how it was done in his presence. He admits that Plass produced the certificates in the cab, and that Sullivan checked off the same upon his list, but denies that he ever handled the bonds or securities, or that they were in his possession, and says that as fast as Sullivan checked the bonds off he put them between himself and the side of the cab. He admits the payment of the $5,000 to Plass and the $50 to himself, but claims it was paid as his retainer. He admits going to the Night and Day Bank with Plass after Sullivan had left the cab, but claims it was only to get his $50 bill changed, although he was on his way to the Belmont Café, where wine was bought by him, and where during the drinking he was introduced to Yates and Ross, but not by their names.

Stripped of its voluminous denials, in the course of which almost every fact testified to by any other witness, excepting the fact of his presence in the cab and the return of the securities, was contradicted by the defendant, his theory of the situation is that he was retained by Sullivan and a fee of $50 promised to assist in the return of the securities, and that his first intention was to try and get the thieves arrested with the property upon them, and his later intention was to help the authorities to get the securities. He admitted on cross-examination that the holding of these securities for a reward would have been a crime, and that as he viewed it, if he was working with Plass

and for his interest, he was guilty of the offense charged, whether he touched the securities or not; but if he were actually and honestly working with Sullivan and on his behalf, it made no difference whether he ever had the physical custody of the securities.

[2] Section 1308 of the Penal Law, under which the defendant is indicted, provides:

"A person who buys or receives any stolen property or any property which has been wrongfully appropriated in such manner as to constitute a larceny according to this article, knowing the same to have been stolen or so dealt with, or who corruptly for any money reward or promise or agreement for the same conceals, withholds or aids in concealing or withholding any property knowing the same to have been stolen or appropriated wrongfully, in such a manner as to constitute larceny under the provisions of this article if such misappropriation has been committed within the state, whether such property was so stolen or misappropriated within or without the state, * * * is guilty of criminally receiving such property."

The foregoing statement of the evidence adduced upon the trial renders a discussion of the guilt of the defendant unnecessary. That defendant knew this property was stolen was conceded, and that he received the property from Plass when in the taxicab, and held it in his possession until the reward was paid, when he delivered it over to Sullivan, who represented the owner, and at the same time received for his own use the sum of $50, is conclusively established. Whether he was "nominally" retained by Sullivan to assist him in securing the property or not seems to me immaterial, as it is clear that he represented the thieves and acted as their representative in obtaining from Sullivan, representing the owner of the property, the sum of $5,000 for the thieves and $50 for himself as a condition for its return to its lawful owner. There can be no doubt but that Plass was guilty of receiving this stolen property, and extorted the sum of $5,000 from its owner as a condition of its return, and that the defendant aided and abetted him in the transaction and thereby became a principal. Section 2 of the Penal Law. Whether the defendant is to be treated as a principal, or as aiding and abetting Plass in receiving and retaining this stolen property until the reward was paid, would make no material difference. Both were guilty of the crime, and subject to indictment and conviction as principals.

The court charged the jury, if they found, as claimed by the defendant, that he did not represent the thieves and was not acting on their behalf or for their advantage, but was simply acting as the paid attorney of the owner, or was simply acting in a disinterested way to help the police to run down the thieves or to obtain the restoration of the property, that then he was not guilty of any crime, and if through all these transactions he honestly believed he was acting innocently, and held that belief honestly, he was not guilty of any crime; and at the request of the defendant the court charged the jury that if the defendant was present in the taxicab with the honest purpose of aiding and assisting the lawful owner in procuring the restoration of the stolen property he was not guilty of any offense. This instruction was certainly as favorable as the defendant could have claimed, and there

was no exception to the charge, or any request by the defendant to the court to charge which was refused.

The defendant was a lawyer, and told his own story to the jury, and so far as there was a question of fact raised by his denial of the testimony offered for the prosecution the jury decided against him. An examination of this testimony entirely satisfies us that the verdict of the jury was correct, and that the defendant was guilty, and we are convinced that the jury could have arrived at no other conclusion upon any fair and intelligent consideration of the testimony.

The defendant has asked for a reversal because of certain alleged errors in the receipt and exclusion of testimony in regard to the witnesses produced by the defendant as to his character. We have examined all those rulings, but none of them would justify a reversal of the judgment. Most of the questions which were objected to and allowed were rendered clearly competent by the nature of the direct examination of the character witnesses, or by the testimony of the defendant himself on the stand. We think it entirely clear that the defendant had a fair trial, that all his rights were properly preserved, that the testimony overwhelmingly established his guilt, and that there was no ruling on the trial which would justify a reversal.

Entertaining this conviction, it follows that the judgment appealed from is affirmed. All concur.